

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00132-CR

_____

MATTHEW WOLFE, Appellant

V.

THE STATE OF TEXAS

_____

On Appeal from Criminal District Court No. 1
Tarrant County, Texas
Trial Court No. 1691858D

_____

Before Kerr, Bassel, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

In five points, Appellant Matthew Wolfe challenges his six convictions for aggravated kidnapping, burglary, aggravated robbery, two counts of aggravated assault, and injury to an elderly individual. In his first point, Appellant contends that he was denied the right to act as his own counsel. We rule against Appellant on this point because he failed to timely assert his right to self-representation. In his remaining four points, Appellant contends that multiple punishments are being imposed upon him in violation of the prohibition against double jeopardy. The State concedes the merit of three of Appellant's points, and we agree.[1] For each of those points, we will retain the most serious of the convictions for which Appellant received multiple punishments in violation of the prohibition against double jeopardy. With respect to the remaining point—number four—we disagree that Appellant received multiple punishments for the same offense in violation of the prohibition against double jeopardy. Accordingly, we vacate three of the trial court's judgments and affirm the remaining three judgments.

---

[1]Because the State's confession of error is not dispositive, we still look at the merits. *See Saldano v. State*, 70 S.W.3d 873, 884 (Tex. Crim. App. 2002).

## II. Factual and procedural background

The underlying facts of the offenses committed have only a tangential impact on the points that Appellant raises. Thus, we detail those facts, which occurred on July 7, 2021, only to the extent summarized in Appellant's brief:

> Appellant was staying with a friend at her apartment in Tarrant County. Across from her apartment lived the complainant, a 62-year-old man, his daughter[,] and his granddaughter. According to the complainant, Appellant asked to borrow his car[,] and when he declined, Appellant followed him into his apartment and began assaulting him. According to Appellant, he saw the complainant leaning over his naked grandchild in a concerning way[,] causing Appellant to enter the apartment to protect the child. Appellant had been the victim of sexual abuse as a child and was triggered by the complainant's behavior with the unclothed child.
>
> Appellant [dragged] the complainant to his friend's adjacent apartment, shut the door, locked it[,] and continued to assault the complainant, kicking him and hitting him with a cooking pot. Appellant then took the complainant's car keys and left the location in his car. [Record references omitted.]

The jury convicted Appellant of the following offenses and assessed the following punishments:

- aggravated kidnapping with a deadly weapon—25 years;

- burglary of a habitation—25 years;

- aggravated robbery with a deadly weapon—25 years;

- aggravated assault with a deadly weapon causing bodily injury—40 years;

- aggravated assault by threat with a deadly weapon—40 years; and

- injury to an elderly individual—40 years.[2]

The trial court signed judgments reflecting the jury's verdicts on guilt and punishment after sentencing Appellant in accordance with the verdicts. The trial court also ordered that Appellant's sentences would run concurrently. Appellant timely filed a notice of appeal and then filed a "Motion for New Trial and Motion in Arrest of [Judgment]" that was overruled by operation of law.

## III. Analysis

### A. We overrule Appellant's first point because he was not improperly deprived of the right to self-representation.

In Appellant's first point, he claims that the trial court "violated *Faretta*[3] and Appellant's state and federal rights of self-representation." Appellant made no clear and unequivocal request to self-represent until it was too late to invoke that right.

#### 1. We summarize the three chapters that chart the story of Appellant's self-representation claim.

##### a. The first chapter

The first chapter occurred approximately six weeks before trial at a pretrial hearing presided over by a magistrate. The concern expressed by Appellant at the pretrial hearing was that his counsel was the son of a Tarrant County District Judge

---

[2]With respect to punishment, for each count of the charge, the jury found a habitual-offender notice to be true.

[3]*See Faretta v. California*, 422 U.S. 806, 835, 95 S. Ct. 2525, 2541 (1975) (requiring a court to ensure that an accused who wants to manage his or her own defense understands the dangers and disadvantages of self-representation).

who had accepted a plea bargain from Appellant and had sentenced him to prison almost two decades earlier. Appellant expressed the nature of the problem and his thoughts on how to solve the problem as follows:

> Your Honor, I believe that there may be a conflict of interest due to the fact that Mr. Salvant has a relative that sentenced me to prison for 12 years back [in] 2002 -- 2003. I explained this to my attorney, Mr. Salvant. It was brought to my attention, you know, that it was a conflict of interest by another attorney that I've talked to. *And at this point, I'm asking for a little time to either hire a new attorney or to essentially maybe have another one appointed.* [Emphasis added.]

The trial court indicated that it did not see a conflict and told Appellant that he could hire a new lawyer if he wanted and that it was late in the process to bring up Appellant's concern. Appellant never asserted a right to self-representation during the pretrial hearing.

### b.     The second chapter

The second chapter of the story occurred on the morning before voir dire was conducted. At the request of his counsel, Appellant testified about his ongoing concern that a conflict of interest existed between his present counsel and him. Again, the conflict centered on the fact that his counsel's father had sentenced him to prison. When Appellant reiterated his concern, he made a passing mention of representing himself:

> I was informed by another lawyer that that definitely is a conflict of interest. And upon me getting able to be able to work again and

speaking with you in-person where I actually got down there to the office, you[4] agreed with me that it was . . . a conflict.

*So essentially that let me put a couple of options to hire an attorney, have another one appointed[,] or* **represent myself.** I was told that . . . one particular attorney, she had told me that there was no way she could prepare for trial within the time allotted. And the last time that I . . . spoke to you, you said the last time we came to court, which was yesterday, is that we were going to get it on record and just try to get it figured out, or we could, you know, proceed on. [Emphases added.]

The trial court (now presided over by the court's elected judge) ruled that there was no conflict. Appellant's counsel then sought a continuance, which was denied.

### c. The third chapter

The third chapter occurred during the trial (which was being conducted by a visiting judge) after the State had rested. This third chapter began when Appellant's counsel informed the trial court that he could not announce ready to present the defense's case because Appellant had given him a list of seven witnesses whom he wanted to testify, and Appellant's counsel sought a continuance to locate and subpoena the witnesses. The trial court implicitly overruled the motion for continuance but gave Appellant's counsel ten minutes to talk with Appellant. After a discussion, Appellant's counsel indicated that Appellant wanted to address the court. The trial court noted that the proceeding was at "midtrial," that the State had presented all of its evidence and had rested, and that the jury was in the jury room.

---

[4]The "you" throughout this block quote appears to be a reference to Appellant's lawyer.

Appellant reiterated his complaints about a conflict of interest with his counsel and then told the trial court that he was dissatisfied with his lawyer's performance for apparently not cross-examining witnesses as he thought they should be and for not calling certain witnesses. Appellant stated that he wanted his present counsel removed from the case and a new lawyer appointed or to represent himself. This produced a discussion with the trial court regarding whether Appellant was equivocal in the desire to represent himself. As the discussion continued, Appellant then raised an additional complaint that his present lawyer's investigator was Appellant's former parole officer.

After the trial court told Appellant that the case would proceed that day, the trial court again asked if Appellant wanted to represent himself, and he said that he did. The trial court then began interrogating Appellant on his level of knowledge and describing the pitfalls of self-representation. The hearing continued with Appellant's stating that he had no choice but to represent himself because of the allegedly subpar representation that he had received to that point.

When again confronted with the fact that the trial would proceed and asked whether he still wished to waive his attorney, Appellant responded tentatively in response to when he could proceed:

> THE COURT: Okay. Well, ultimately, . . . it's up to you. You've . . . got to freely and knowingly waive your right to an attorney.
>
> Are you willing to do that?

[APPELLANT]:  I am.

THE COURT:  And would you be doing so understanding that you're going to proceed today?  Is that what you're asking the [c]ourt to do?

[APPELLANT]:  I don't know if . . . I could proceed today.  I don't have the pertinent information in front of me to be able to understand if I have enough time to be able to answer that question.

THE COURT:  Okay.

[APPELLANT]:  I would like, in the very least, to be able to get my hands on, you know, the court records, pertinent paperwork that I need to . . . adequately represent myself.

THE COURT:  Okay.  So it sounds like there would be a considerable delay involved?

[APPELLANT]:  I don't think that there would be a considerable delay.  I think that in order to answer that question with honesty and respect to you, I would have to . . . see what was in front of me before I could answer that question.

The hearing continued with Appellant's being vague about when he would be ready to proceed but being certain that he wanted to represent himself in view of the representation that he had received.  A later exchange went as follows:

THE COURT:  I mean, you've previously indicated that you really don't feel that you're prepared to proceed today; is that right?

[APPELLANT]:  I don't know.  I don't have the information in front of me to be able to -- to --

THE COURT:  Okay.

[APPELLANT]:  -- make that decision.

THE COURT:  All right.

8

[APPELLANT]: What I do . . . know is that I would rather represent myself than have Mr. Salvant as my attorney.

THE COURT: Okay.

After this exchange, the State noted that Appellant's request was untimely. As the colloquy between Appellant and the trial court continued, the trial court expressed its concern that the trial would be disrupted by Appellant's self-representation and that the request to do so was a delay tactic. Appellant responded that he was not being properly represented, that he intended to cross-examine the witnesses as he wished, and that he intended to get a not-guilty verdict. Appellant again reiterated a desire to pursue his own trial strategy: "It is . . . not my attorney's strategy, even against -- he works for me. If it's not his strategy, this is my strategy. My strategy is to be able to cross-examine these witnesses. If he is in disagreement with that, then there's . . . ."

Ultimately, the trial court denied Appellant's request for self-representation because it was equivocal and conditional.

### 2. We set forth the standard of review that we apply to Appellant's contention that he was deprived of the right to self-representation.

We apply the following standard of review to a point challenging the denial of the right to self-representation:

> We review the denial of a defendant's request for self-representation for an abuse of discretion. We view the evidence in the light most favorable to the trial court's ruling, and we imply any findings of fact supported by

9

the record and necessary to affirm the ruling when the trial court did not make explicit findings.

*Lathem v. State*, 514 S.W.3d 796, 802 (Tex. App.—Fort Worth 2017, no pet.)

(footnotes omitted).

So long as there is a valid legal theory to uphold a ruling, we will do so even if the trial court articulated a different—and arguably wrong—reason for its ruling. Specifically,

> a trial court's ruling must generally be upheld if it is correct "on any legal theory applicable to the case, even one that was not mentioned by the trial court or the appellee." *Spielbauer v. State*, 622 S.W.3d 314, 319 (Tex. Crim. App. 2021). This principle is known as the "right ruling, wrong reason" doctrine. *State v. Herndon*, 215 S.W.3d 901, 905 n.4 (Tex. Crim. App. 2007).

*Martell v. State*, 663 S.W.3d 667, 672 (Tex. Crim. App. 2022).

### 3. We set forth the principles that govern a defendant's right to self-representation.

The Court of Criminal Appeals has recently described the foundation of the right to self-representation, how the right is invoked, and the processes a trial court must follow before allowing a defendant to self-represent:

> It is well established that every criminal defendant has a constitutional right to the assistance of counsel and the constitutional right to self-representation. U.S. Const. amend. VI; Tex. Const. art. I[,] § 10; *Faretta*, 422 U.S. at 835, 95 S. Ct. [at 2541]. "The right to self-representation and the assistance of counsel are separate rights depicted on the opposite sides of the same Sixth Amendment coin. To choose one obviously means to forego the other." [*United States v.*] *Purnett*, 910 F.2d [51,] 54 [(2d Cir. 1990)]; *see Martin v. State*, 630 S.W.2d 952, 953 (Tex. Crim. App. 1982) [(op. on reh'g)]. "While the right to counsel is in force until waived, the right of self-representation does not attach until asserted."

10

*Brown v. Wainwright*, 665 F.2d 607, 610 (5th Cir. 1982) [(op. on reh'g)]; *see Williams v. State*, 252 S.W.3d 353, 356, 358 (Tex. Crim. App. 2008). Assertion of the right to self-representation must be clear and unequivocal. *See Faretta*, 422 U.S. at 835, 95 S. Ct. [at 2541]. "When a criminal defendant chooses to waive his right to counsel and represent himself, the waiver should be made 'knowingly and intelligently,' and he should be warned of the 'dangers and disadvantages' accompanying such waiver" so that "the record will establish that 'he knows what he is doing and his choice is made with open eyes." *Hatten v. State*, 71 S.W.3d 332, 333 (Tex. Crim. App. 2002); *Collier v. State*, 959 S.W.2d 621, 626 (Tex. Crim. App. 1997) (citing *Faretta*, 422 U.S. at 834–36, 95 S. Ct. [at 2541, and stating that] decision to waive counsel in favor of self-representation is "knowing and intelligent" if "it is made with a full understanding of the right to counsel, which is being abandoned, as well as the dangers and disadvantages of self-representation"). "'[C]ourts indulge every reasonable presumption against waiver' of fundamental constitutional rights . . . ." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, [1023] (1938)[, *abrogation recognized by Jones v. Hendrix*, No. 21-857, 2023 WL 4110233, at *11 (U.S. June 22, 2023)]. Whether a waiver of counsel was effective depends on the totality of the circumstances, which includes considering "the background, experience, and conduct of the accused." *Id.*[, 58 S. Ct. at 1023.] "An invalid waiver waives nothing." *Williams*, 252 S.W.3d at 358. In such case, the right to counsel remains in effect, and a defendant is entitled to counsel. *See id.* (allowing a defendant to represent himself "without a valid waiver of the right to counsel" denies that defendant . . . the right to counsel). A complete denial of the constitutional right to counsel is a structural defect, and "prejudice is presumed because the trial has been rendered inherently unfair and unreliable." *Id.* at 357.

"The record must reflect that the trial court thoroughly admonished the defendant." *Collier*, 959 S.W.2d at 626 n.8 ([first] citing *Faretta*, 422 U.S. at 834–36, 95 S. Ct. [at 2541]; [and then citing] *Blankenship v. State*, 673 S.W.2d 578, 583 (Tex. Crim. App. 1984)). For example, defendants must be aware "that there are technical rules of evidence and procedure, and he will not be granted any special consideration solely because he asserted his pro se rights." *Johnson v. State*, 760 S.W.2d 277, 279 (Tex. Crim. App. 1988). But "a trial court need follow no 'formulaic questioning' or particular 'script' to assure itself that an accused who has asserted his right to self-representation does so with eyes open." *Burgess v. State*, 816 S.W.2d 424, 428 (Tex.

Crim. App. 1991). And a defendant need not have the skill and experience of a lawyer "to competently and intelligently choose self-representation," *Faretta*, 422 U.S. at 835, 95 S. Ct. [at 2541]. The focus is on whether the defendant is competent to choose to proceed pro se, not whether he is equipped to represent himself at trial. *Godinez v. Moran*, 509 U.S. 389, 400–01, 113 S. Ct. 2680, [2687–88] (1993).

*Osorio-Lopez v. State*, 663 S.W.3d 750, 756–57 (Tex. Crim. App. 2022).

### 4. To invoke the right to self-representation, a defendant must assert the right clearly and unequivocally.

With respect to the requirement that the assertion of the right to self-representation be clear and unequivocal, opinions from this court cover both ends of the spectrum on what constitutes an adequate assertion. We have held that the invocation of the right to self-representation does not require "magic words":

> There are no magic words ("no talismanic formula") that need be recited to invoke this right. Whether a defendant states that she wants to act as her own lawyer or to be her own legal counsel or she names herself as her own legal counsel, as [a]ppellant did in this case, such statements clearly and unequivocally apprise the trial court that she wants to represent herself at trial.

*Lathem*, 514 S.W.3d at 809 (footnote omitted). In *Lathem*, the statement, "I'll name myself as counsel," was a clear invocation of the right to self-representation. *Id.* at 808; *see also Cochnauer v. State*, No. 02-19-00165-CR, 2021 WL 3931914, at *6–7 (Tex. App.—Fort Worth Sept. 2, 2021, no pet.) (mem. op., not designated for publication) (holding that the right to self-representation was invoked by the statement, "I feel like I'm going to have to represent myself").

12

But on the other side of the spectrum—no matter the lack of a requirement for magic words—a defendant must at least make a statement indicating the desire to self-represent. We have held that a conditional inquiry—such as, "May I ask, Your Honor, if I choose to represent myself how long I would have to prepare a defense?"—is not a clear and unequivocal invocation of the right to self-representation. *See Pickett v. State*, No. 2-08-439-CR, 2009 WL 3246755, at *8 (Tex. App.—Fort Worth Oct. 8, 2009, no pet.) (mem. op., not designated for publication). In *Pickett*, to illustrate the clarity that the invocation must contain, we cataloged several cases:

> The right of self-representation does not attach "until it has been clearly and [unequivocally] asserted." *Williams*, 252 S.W.3d at 356 (quoting *Funderburg v. State*, 717 S.W.2d 637, 642 (Tex. Crim. App. 1986)); [*Ex parte*] *Winton*, 837 S.W.2d [134,] 135 [(Tex. Crim. App. 1992)] (explaining that a defendant "should be allowed to so proceed so long as the assertion of his right to self-representation is unconditional"); *see also Burton v. Collins*, 937 F.2d 131, 134 (5th Cir. [1991]) (holding that an assertion of self-representation is not clear and unequivocal when it is "an inquiry into alternatives") . . . ; *Barrientes v. State*, No. 04-06-00541-CR, 2007 WL 1888378, at *1 (Tex. App.—San Antonio July 3, 2007, no pet.) (mem. op., not designated for publication) (holding that the defendant's asking, "Can I represent myself?" was not a clear and unequivocal invocation of his right of self-representation and that without such an invocation, "the trial court has no duty to make further inquiry" to that right). A defendant's alleged assertion of his right to self-representation must be examined in the context of the record. *See DeGroot v. State*, 24 S.W.3d 456, 458 (Tex. App.—Corpus Christi[–Edinburg] 2000, no pet.).

*Id.* at *7. Other courts have dealt with the same question. *See, e.g., Rucker v. State*, No. 03-19-00493-CR, 2021 WL 501113, at *8 (Tex. App.—Austin Feb. 11, 2021, no pet.)

13

(mem. op., not designated for publication) (holding that statements—that defendant "would be happy to go pro se" and that he would be "better off being pro se rather than being represented by an attorney who is going to subvert [his] access to the [c]ourt"—were not invocations of the right to self-representation); *Walker v. State*, No. 03-09-00622-CR, 2010 WL 5078229, at *2–3 (Tex. App.—Austin Dec. 8, 2010, no pet.) (mem. op., not designated for publication) (holding that a query regarding whether defendant could represent himself was not an invocation of the right to self-representation); *DeGroot*, 24 S.W.3d at 458 (holding that defendant's statement—that "I think I'll proceed without an attorney"—taken in context was not an invocation of the right of self-representation).

Case law is also clear that an expression of dissatisfaction with appointed counsel and a request for the appointment of new counsel is not a clear and unequivocal assertion of the right to self-representation. *See, e.g.*, *Lara v. State*, Nos. 11-18-00286-CR, 11-18-00317-CR, 2020 WL 6373241, at *2 (Tex. App.—Eastland Oct. 30, 2020, pet. ref'd) (mem. op., not designated for publication) (holding that duty to admonish about the dangers of self-representation was not triggered when "[a]ppellant never expressed an interest in representing himself at trial. Instead, [a]ppellant informed the trial court that he was displeased with appointed counsel and that he wanted to 'discharge him or fire him'"); *Masters v. State*, No. 14-11-00263-CR, 2012 WL 2899765, at *3 (Tex. App.—Houston [14th Dist.] July 17, 2012, no pet.) (mem. op., not designated for publication) ("Appellant's expression of dissatisfaction

with trial counsel does not constitute a clear and unequivocal assertion of the right to self-representation."); *Denmark v. State*, No. 06-02-00222-CR, 2004 WL 314884, at \*2 (Tex. App.—Texarkana Feb. 20, 2004, no pet.) (not designated for publication) ("A request for a new attorney is not a clear and unequivocal request to represent oneself.").

> **5.** **The right of self-representation must be asserted timely; in Texas, the assertion must be made before the jury is impaneled.**

Further, the assertion of the right to self-representation must be timely. Though Appellant makes an argument challenging the deadline that we conclude exists, the case law establishes that there is a bright-line boundary of timeliness—the request for self-representation must occur before the jury is impaneled.

Although a bit of confusion exists in the Court of Criminal Appeals' precedent, decades ago the First Court of Appeals reconciled the higher court's holdings to conclude that a bright-line deadline exists for asserting the right to self-representation before the jury is impaneled:

> Previously, the Texas Court of Criminal Appeals has held that a request for self-representation was timely despite its assertion after the jury was impaneled. *See Johnson v. State*, 676 S.W.2d 416, 419 (Tex. Crim. App. 1984) (finding request timely because no evidence had been presented to jury). However, *Johnson* is in direct conflict with other Texas Court of Criminal Appeals['] cases, a 1984 decision and two more recent decisions, addressing the timeliness of a request for self-representation. *See Winton*, 837 S.W.2d at 135 (stating request untimely if made after jury is impaneled); *Blankenship* . . . , 673 S.W.2d [at] 585 . . . (same); *McDuff v. State*, 939 S.W.2d 607, 619 (Tex. Crim. App. 1997) (holding denial of request for self-representation was not error because right was untimely

15

asserted after jury had been impaneled). The jury is considered impaneled when its members are selected and sworn. *See Hill v. State*, 827 S.W.2d 860, 864 (Tex. Crim. App. 1992).

*Leighton v. State*, No. 01-02-00378-CR, 2002 WL 31265487, at \*2 (Tex. App.—Houston [1st Dist.] Oct. 10, 2002, pet. ref'd) (not designated for publication). Further, the Fifth Circuit viewed the Court of Criminal Appeals' holding in *Johnson*—suggesting that the right to self-representation may be asserted after impaneling the jury—as being unsupported by the federal precedent that it cited. *Johnson v. Collins*, No. 93-2311, 1994 WL 121803, at \*2 (5th Cir. Mar. 22, 1994) (per curiam).[5]

Relying on the holdings from the Court of Criminal Appeals, a number of courts of appeals—including our own—have held that a request to self-represent must be made before the jury is impaneled. *See, e.g., Carver v. State*, No. 12-22-00164-CR, 2023 WL 327815, at \*4 (Tex. App.—Tyler Jan. 19, 2023, pet. ref'd) (mem. op., not designated for publication) ("An accused must assert his right to self-representation in a timely manner, namely, before a jury is impaneled."); *Yadav v. State*, Nos. 04-19-00483-CR, 04-19-00486-CR, 2020 WL 4606898, at \*8 (Tex. App.—San Antonio Aug. 12, 2020, pet. ref'd) (mem. op., not designated for publication) ("Here, [appellant] first invoked his right of self-representation after both sides had rested, long after the jury was impaneled. As a result, his request to represent himself was untimely."); *Calderon v. State*, No. 10-17-00265-CR, 2019 WL 962310, at \*3 (Tex.

---

[5]Although both cases are styled *Johnson*, they are unrelated. *See* 1994 WL 121803, at \*2.

16

App.—Waco Feb. 27, 2019, pet. ref'd) (mem. op., not designated for publication) (stating that appellant "did not assert his right to self-representation until after the State [had] rested its case-in-chief—much later than the impaneling of the jury and, to the extent it is relevant, the reading of the indictment and the presentation of the State's evidence" and holding that "we cannot say that [appellant] timely asserted his right to self-representation"); *Lathem*, 514 S.W.3d at 809–10 ("The State ignores well-settled law that a request for self-representation is timely if brought before the jury is impaneled."); *Birdwell v. State*, 10 S.W.3d 74, 77 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) (stating that the right to self-representation "must . . . be asserted in a timely manner, namely, before the jury is [i]mpaneled").

No matter how the case law stacks up against his argument, Appellant persists in arguing that the timeliness requirement is not valid because it was engrafted "via dicta" and is contrary to the general principles for the preservation of error. But it is not our role as an intermediate appellate court to overrule or ignore the precedent of the Court of Criminal Appeals. Indeed, one of our sister courts declined an invitation from an appellant to overturn the holdings of the Court of Criminal Appeals that establish a bright-line deadline for the assertion of the right to self-representation:

> [Appellant] invites us to ignore the timeliness requirement because there is no solid rationale for the rule[] and because the State cannot demonstrate that his self-representation would have interfered with the trial process. However, given that we are an intermediate appellate court and are bound to follow the precedent of the Court of Criminal Appeals, we are not inclined to adopt [appellant's] argument regarding the timeliness factor.

17

*Calderon*, 2019 WL 962310, at *3. We decline Appellant's similar invitation in this appeal.

Even if we were inclined to address Appellant's challenge to a deadline set before the impanelment of the jury, we would reject it. Appellant argues that "[a]n accused's constitutional right to self-representation is perpetual[;] it does not disappear after trial has begun. It cannot be infringed by time limitations. An accused has the right prior to trial and during trial." [Citations omitted.] The federal courts analyzing the right to self-representation appear to disagree with Appellant.

As stated by the Fifth Circuit, the United States Supreme Court has concluded that the right to self-representation can be infringed by time limitations. *Moses v. Davis*, 673 F. App'x 364, 368–69 (5th Cir. 2016) (per curiam). In *Moses*, the Fifth Circuit explained that

> [t]he Supreme Court has made clear . . . that "the right of self-representation is not absolute," *Indiana v. Edwards*, 554 U.S. 164, 171, 128 S. Ct. 2379, [2384] (2008), and has noted with approval that "most courts require [a defendant to elect self-representation] in a timely manner." *Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.*, 528 U.S. 152, 162, 120 S. Ct. 684, [691] (2000) (footnote omitted). The Court explained, "the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." *Id.* The Court has not, however, made clear at what point a request for self-representation becomes sufficiently untimely that a trial judge could deny the request without running afoul of the Sixth Amendment. *See Miller v. Thaler*, 714 F.3d 897, 903 n.5 (5th Cir. 2013).

*Id.* at 368. Though it did not place its imprimatur on the holding, *Moses* mentioned that a prior Fifth Circuit authority had noted that "[i]f there is to be a Rubicon beyond

18

which the defendant has lost his unqualified right to defend pro se, it makes far better sense to locate it at the beginning of defendant's trial[] when the jury is [i]mpaneled and sworn." *Id.* at 368 (quoting *Chapman v. United States*, 553 F.2d 886, 894 (5th Cir. 1977)).

*Moses* went on to catalog a Fifth Circuit holding and other circuits' holdings that denied federal habeas relief for self-representation assertions made as jury selection was to commence or after a jury was impaneled:

> Furthermore, this court has previously held that federal habeas relief was not appropriate where a state habeas court had determined a defendant's request to proceed pro se to be untimely because the request had been made "only a few hours *before* jury selection." *Miller*, 714 F.3d at 903 n.5 (emphasis added). Here, [appellant] demanded to present his own defense only *after* the jury had been selected. *Miller* supports the state habeas court's position that the district court had discretion to deny [appellant's] request to proceed pro se because the request was made after the jury had been selected. *See id.* Other circuits have come to similar conclusions. *See, e.g., Hill v. Curtin*, 792 F.3d 670, 674, 679 (6th Cir. 2015) (en banc) (refusing to grant habeas relief on *Faretta* claim because defendant requested self-representation on the first day of trial, before jurors had been [i]mpaneled); *United States v. Bishop*, 291 F.3d 1100, 1114 (9th Cir. 2002) ("In cases involving jury trials, we have held that a request is timely if made before the jury is selected or before the jury is [i]mpaneled, unless it is made for the purpose of delay."); *United States v. Young*, 287 F.3d 1352, 1354–55 (11th Cir. 2002) (holding that defendant's request to proceed pro se was untimely when made after the jury was [i]mpaneled but before it was sworn). At the very least, the law on this point is not clearly established, and the district court therefore erred when it held the state habeas court unreasonably applied clearly established federal law.

*Id.* at 369 (footnote omitted). Thus, Appellant's premise—that federal law dictates Texas courts cannot draw a line that makes the invocation of the right to self-

19

representation untimely—fails. Appellant's further apparent argument—that no line can be drawn at the point when a jury is impaneled—also fails.

### 6. Why we conclude that the trial court did not abuse its discretion by denying Appellant the right to self-representation.

The three chapters that chart Appellant's claim that he was deprived of the right to self-representation play out as follows:

- In the first chapter, Appellant made no assertion of the right to self-representation and did not even mention that course of action. He complained about his appointed lawyer and wanted a new lawyer; that is not a clear and unequivocal assertion of the right to self-representation. *See Lara*, 2020 WL 6373241, at *2; *Masters*, 2012 WL 2899765, at *3; *Denmark*, 2004 WL 314884, at *2.

- In the second chapter, Appellant claimed a conflict of interest based on the fact that his lawyer's father was a judge who had previously sentenced Appellant and mentioned the following options: "So essentially that let me put a couple of options to hire an attorney, have another one appointed[,] or represent myself." This is the only reference to self-representation in the second chapter. It is a mention of the possibility of self-representation, among other options, and is hardly a clear and unequivocal assertion of the right to self-representation. *See Pickett*, 2009 WL 3246755, at *8. Because

the assertion was not clear and unequivocal, the trial court had no duty to admonish further about the right to self-representation.

- There is no doubt that the third chapter contains Appellant's clear and unequivocal assertion of the right to self-representation. That assertion came during the trial after the State had presented its case and had rested.

We have outlined Texas law that establishes a bright-line deadline for the assertion of the right to self-representation—the point at which a jury is impaneled. We have addressed Appellant's contention that the Texas rule is in violation of the constitutional right to self-representation. Rather than undermine the Texas rule, authority from the Fifth Circuit and other federal circuits shows that courts have the power to create a deadline. Even if the federal case law did not support the Texas rule, the rule is one established by the Court of Criminal Appeals, and it is not within our purview to change it.

Appellant simply asserted his right to self-representation too late. *See Carver*, 2023 WL 327815, at *4; *Yadav*, 2020 WL 4606898, at *8; *Calderon*, 2019 WL 962310, at *3.[6] Though the trial court did not explicitly rely on the timeliness of Appellant's

---

[6]Appellant argues that there should be no bright line for the assertion of the right to self-representation and that loss of the right should depend on whether the assertion disrupts the "system." In his words, "[t]he *Faretta* rights should not be held to a rigid timeline[] but to a factual determination of whether it would unduly disrupt the system or be used to manipulate a delay." Later in his brief, he argues that there would have been no disruption because "[d]uring the trial, [he] repeatedly stated that he would proceed the same day and that he was not trying to delay the proceedings in any regard[] but simply wanted to put forward his personal defense." We have quoted

assertion to deny it, that state of affairs demonstrates a legal reason establishing that the trial court did not abuse its discretion by denying Appellant's assertion of the right to self-representation.

We overrule Appellant's first point.

## B.     We sustain some of Appellant's double-jeopardy violations.

In the remainder of his appellate points, Appellant asserts that his multiple convictions constitute double-jeopardy violations.

### 1.     We set forth Appellant's multiple convictions and how we resolve his points claiming that he received multiple punishments for the same offense.

We quote the State's outline of the offenses for which Appellant was indicted and convicted; each offense relates to the events occurring on July 7, 2021, and each was snapshotted in the factual background section of this opinion:

- Count One:   Aggravated kidnapping with a deadly weapon by intentionally or knowingly abducting [the complainant] by secreting or holding him in a place where he was not likely to be found or using or threatening to use deadly force, namely a metal object or pot, and using or exhibiting a deadly weapon (a metal object or pot) in a manner capable of causing death or serious bodily injury.

- Count Three:   Burglary of a habitation by intentionally or knowingly entering [the complainant's] habitation without his effective consent and committing or attempting to commit the offense of injury to an elderly individual.

---

the portion of the record in which Appellant was evasive in response to questions about how long he would need to prepare should he be permitted to represent himself. Because of the stage of the trial and Appellant's equivocation, an implied finding of unreasonable delay is also supported by the record.

- Count Four:   Aggravated robbery with a deadly weapon by intentionally, knowingly[,] or recklessly, while in the course of committing theft of property and with intent to obtain or maintain control of said property, caused bodily injury to [the complainant] by striking him, using or exhibiting a deadly weapon (a metal object or pot) in a manner capable of causing death or serious bodily injury.

- Count Five:   Aggravated assault with a deadly weapon by intentionally or knowingly causing bodily injury to [the complainant], by striking him, and using or exhibiting a deadly weapon (a metal object or pot) in a manner capable of causing death or serious bodily injury.

- Count Six:  Aggravated assault with a deadly weapon by intentionally or knowingly threatening imminent bodily injury to [the complainant], and using or exhibiting a deadly weapon (a metal object or pot) in a manner capable of causing death or serious bodily injury.

- Count Seven:   Injury to an elderly individual by intentionally or knowingly causing bodily injury to [the complainant], an elderly individual, by striking him with his hand, or by striking him with a metal object or pot, or by kicking him with his foot, and using or exhibiting a deadly weapon (a metal object or pot) in a manner capable of causing death or serious bodily injury.[7]

Appellant contends in his second through fifth points that convictions for the listed offenses subject him to multiple punishments for the same offense in several regards and that these multiple punishments violate the constitutional prohibition on double jeopardy.  Specifically, Appellant contends that the following double-jeopardy violations have occurred:

- His second point argues that there were multiple punishments for the convictions for aggravated robbery with a deadly weapon by causing

[7]The State waived Count Two of the indictment that alleged burglary by entering with intent to commit injury to the elderly.

23

bodily injury and for aggravated assault with a deadly weapon by causing bodily injury referenced in Counts Four and Five.

- His third point argues that there were multiple punishments for the convictions for burglary by committing injury to an elderly individual and for committing injury to an elderly individual referenced in Counts Three and Seven.

- His fourth point argues that there were multiple punishments for the convictions for kidnapping by threatening deadly force and aggravated assault by threatening deadly force referenced in Counts One and Six.

- His fifth point argues that there were multiple punishments for the convictions for aggravated assault with a deadly weapon arising from the same assaultive incident referenced in Counts Five and Six.

The State concedes that Appellant's second, third, and fifth points raise meritorious double-jeopardy complaints. We agree. We also agree with the State that Appellant has not suffered a double-jeopardy violation for the punishments referenced in his fourth point.

### 2. Appellant has not forfeited his double-jeopardy claims.

Appellant made no objection on double-jeopardy grounds in the trial court. Even so, "[an appellant can] raise his unpreserved double-jeopardy claim for the first time on appeal . . . if (1) the undisputed facts show a double-jeopardy violation clearly

24

apparent on the face of the record[] and (2) enforcing the usual procedural-default rules serves no legitimate state interests." *Escobedo v. State*, No. 02-19-00260-CR, 2020 WL 6788078, at *2 (Tex. App.—Fort Worth Nov. 19, 2020, pet. ref'd) (mem. op., not designated for publication) (first citing *Gonzalez v. State*, 8 S.W.3d 640, 643 (Tex. Crim. App. 2000); and then citing *Cabral v. State*, 170 S.W.3d 761, 764 (Tex. App.—Fort Worth 2005, pet. ref'd) (mem. op.)). Both Appellant and the State cite this rule, and the State concedes that Appellant is entitled to at least part of the relief that he seeks. Thus, we conclude that Appellant has not forfeited his double-jeopardy complaints.

### 3. We set forth the tests that we apply to determine whether there is a double-jeopardy violation resulting from the imposition of multiple punishments for the same offense.

The United States Constitution's Fifth Amendment's Double-Jeopardy Clause provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The clause serves three purposes:

> The Double[-]Jeopardy Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment, protects an accused against [(1)] a second prosecution for the same offense after acquittal, [(2)] a second prosecution for the same offense after conviction, and [(3)] multiple punishments for the same offense. *Brown v. Ohio*, 432 U.S. 161, 165, 97 S. Ct. 2221, [2225] (1977); *Ex parte Amador*, 326 S.W.3d 202, 205 (Tex. Crim. App. 2010).

*Ex parte Denton*, 399 S.W.3d 540, 545 (Tex. Crim. App. 2013).

The overarching concern of the double-jeopardy protection in a multiple-punishment context is to prevent "a court from prescribing greater punishment than the legislature intended." *Ex parte Benson*, 459 S.W.3d 67, 71 (Tex. Crim. App. 2015).

25

Stated differently, "To decide whether the double-jeopardy protection against multiple punishments for the same offense has been infringed, courts must seek to understand how many punishments the law actually permits: What has the state legislature prescribed with respect to how many times an offender may be punished?" *Nawaz v. State*, 663 S.W.3d 739, 743 (Tex. Crim. App. 2022). And simply because a jury returns multiple verdicts, there is not a double-jeopardy violation; the violation occurs when multiple punishments are assessed for the same offense:

> Clearly, "the State has the right to prosecute and *obtain jury verdicts* on two offenses in a single trial, even if the offenses are the same for double[-]jeopardy purposes." [*Ex parte*] *Aubin*, 537 S.W.3d [39,] 43 [(Tex. Crim. App. 2017)] (emphasis original); *see also Evans* [*v. State*,] 299 S.W.3d [138,] 141 [(Tex. Crim. App. 2009)] (stating that "the State may seek a multiple-count indictment based on violations of different statutes, even when such violations are established by a single act[,] but the defendant may be convicted and sentenced for only one offense"). If actually convicted of both offenses, the court should assess the punishment for only the more serious offense. *Evans*, 299 S.W.3d at 141; *Bigon v. State*, 252 S.W.3d 360, 372–73 (Tex. Crim. App. 2008).

*Perkins v. State*, No. 08-19-00068-CR, 2021 WL 754344, at *2 (Tex. App.—El Paso Feb. 26, 2021, pet. ref'd) (not designated for publication).

A double-jeopardy challenge to multiple punishments may occur in two circumstances: (1) "multiple offenses in different statutory provisions that are the result of a single course of conduct"; or (2) "offenses [that] are alternative means of committing the same statutory offense." *Garfias v. State*, 424 S.W.3d 54, 58 (Tex. Crim. App. 2014); *Loving v. State*, 401 S.W.3d 642, 645 (Tex. Crim. App. 2013). The Court of Criminal Appeals has described the two circumstances under which a

defendant is suffering multiple punishments for the same offense as a result of violating more than one statute:

> There are two variations of a multiple-punishments claim: [(1)] where there are both a greater[-] and a lesser-included offense and the same conduct is punished twice—once for the basic conduct and a second time for that conduct plus more; and [(2)] where the same criminal act is punished under two distinct statutes and the legislature intended the conduct to be punished only once[,] such as causing a single death and being charged with both intoxication manslaughter and involuntary manslaughter.

*Denton*, 339 S.W.3d at 540.

Different tests apply to determine if improper multiple punishments have been imposed, with the determination of which test applies depending "in part on whether the offenses at issue are codified in a single statute or in two distinct statutory provisions." *Benson*, 459 S.W.3d at 71. These are the "elements" and the "units" tests. *Garfias*, 424 S.W.3d at 58.

Before specifically describing the substance of the tests, it is necessary to describe how each applies depending on "whether the offenses at issue are codified in a single statute or in two distinct statutory provisions." *Benson*, 459 S.W.3d at 71. How the tests each apply to distinct situations but may also overlap in their application is described as follows:

> The codification of offenses in two distinct statutory provisions is, by itself, some indication of a legislative intent to impose multiple punishments. When two distinct statutory provisions are at issue, the offenses must be considered the same under both an "elements" analysis and a "units" analysis for a double-jeopardy violation to occur. When only one statute is at issue, the "elements" analysis is necessarily resolved

in the defendant's favor, and only a "units" analysis remains to be conducted.

*Id.* (footnotes omitted).

The "elements" test involves a multistep process that is derived from the United States Supreme Court opinion in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932):

> The elements analysis conducted in the two-statute context begins with the *Blockburger* same-elements test. That test asks "whether each provision requires proof of a fact which the other does not." The application of the *Blockburger* same-elements test in Texas is governed by the cognate-pleadings approach, which entails comparing the elements of the greater offense as pleaded to the statutory elements of the lesser offense. If the two offenses, so compared, have the same elements, then "a judicial presumption arises that the offenses are the same for purposes of double jeopardy" and that the defendant may not be punished for both, but that presumption can be rebutted by a clearly expressed legislative intent to impose multiple punishments. Conversely, if the two offenses have different elements under the *Blockburger* test, the judicial presumption is that the offenses are different for double-jeopardy purposes and that cumulative punishment may be imposed. This presumption can be rebutted by a showing, through various factors, that the legislature "clearly intended only one" punishment.

*Benson*, 459 S.W.3d at 72–73 (footnotes omitted).[8]

---

[8]*Nawaz* offers a more succinct formulation of the "elements" test that was enunciated in *Benson*:

> When separately enumerated penal statutes are involved, this Court has said[ that] "the traditional starting point for determining 'sameness' for multiple-punishment double-jeopardy analysis is the *Blockburger* test." *Ramos*[ v. State], 636 S.W.3d [646,] 651 [(Tex. Crim. App. 2021)] (citing *Blockburger* . . . , 284 U.S. [at] 304, 52 S. Ct. [at 182]). Implementing its "cognate-pleadings approach" to the *Blockburger* "same-elements" test, this Court asks whether each offense, as ple[aded] in the charging

28

The cognate-pleadings "approach" that governs the "elements" test looks to a limited scope of material: "[T]he offenses compared in an 'elements' analysis are derived solely from the pleadings and the relevant statutory provisions. In an 'elements' analysis, a court may not consider the evidence presented at trial." *Benson*, 459 S.W.3d at 73 (footnotes omitted).

But the facts "alleged" still play a critical role in applying the *Blockburger* same-elements test. Two offenses are the same when one is "factually subsumed" within the other, i.e., "[a]n offense may be factually subsumed when there is a single act that cannot physically occur in the absence of another act." *See Maldonado v. State*, 461 S.W.3d 144, 148–49 (Tex. Crim. App. 2015). Even with "offenses that have differing elements under *Blockburger*," a double-jeopardy violation may still exist because "[u]nder the cognate-pleadings approach adopted by th[e] Court[ of Criminal Appeals], double-jeopardy challenges should be made even to offenses that have differing elements under *Blockburger*, if the same 'facts required' are alleged in the indictment." *Denton*, 399 S.W.3d at 546 (quoting *Bigon*, 252 S.W.3d at 370).

---

instrument, contains at least one element that the other does not. *Benson*, 459 S.W.3d at 72. If not, then the Court presumes that the two offenses are the same for multiple-punishment double-jeopardy purposes. *Id.* But if each offense *does* contain an element that the other does not, then the presumption is that the offenses are *different*, and the Court goes on to inquire whether other considerations may operate to defeat that presumption. *Id.* at 72–73 (citing *Ervin v. State*, 991 S.W.2d 804, 814 (Tex. Crim. App. 1999)).

663 S.W.3d at 743–44 (footnote omitted).

In turn, the following factors are then examined to determine whether the legislature intended only a single punishment even though the *Blockburger* test produced the conclusion that the statutes have different elements and presumptively permit multiple punishments, i.e., the *Ervin* factors:

> In . . . *Ervin*, we set forth a non-exclusive list of factors to consider in determining whether the legislature intended only one punishment for offenses that contain different elements under *Blockburger*: (1) whether offenses are in the same statutory section or chapter; (2) whether the offenses are phrased in the alternative; (3) whether the offenses are named similarly; (4) whether the offenses have common punishment ranges; (5) whether the offenses have a common focus or gravamen; (6) whether the common focus tends to indicate a single instance of conduct; (7) whether the elements that differ between the two offenses can be considered the same under an imputed theory of liability that would result in the offenses being considered the same under *Blockburger* (a liberalized *Blockburger* standard); and (8) whether there is legislative history containing an articulation of an intent to treat the offenses as the same or different for double-jeopardy purposes. In some later cases we have given more weight to the fifth and sixth factors, which, in combination, require that we examine the focus or gravamen of each offense and compare the resulting allowable units of prosecution. Although determining the allowable unit of prosecution is part of a separate "units" analysis (conducted when only a single statute is involved or after offenses proscribed by two statutes are deemed the same under an "elements" analysis), consideration of the unit of prosecution can play a role even in an "elements" analysis by helping to ascertain the legislative intent.

*Benson*, 459 S.W.3d at 72–73 (footnotes omitted) (citing *Ervin*, 991 S.W.2d at 814).

Next, with respect to the species of a double-jeopardy claim based on the assertion that a defendant is being punished twice for a greater- and a lesser-included offense, the following test applies:

30

A multiple-punishments double-jeopardy violation occurs if both a greater[-] and a lesser-included offense are alleged and the same conduct is punished once for the greater offense and a second time for lesser. *Langs v. State*, 183 S.W.3d [680,] 685[ (Tex. Crim. App. 2006)]. A lesser-included offense is one that "is established by proof of the same or less than all the facts required to establish the commission of the offense charged[.]" Tex. Code Crim. Proc. [Ann.] art. 37.09(1).

*Denton*, 399 S.W.3d at 546.

The "units" test is used to augment the "elements" test when "two distinct statutory provisions are at issue" and is used as the exclusive test "[w]hen only one statute is at issue":

Even when the offenses in question are proscribed by a single statute or are otherwise the same under an "elements" analysis, the protection against double jeopardy is not violated if the offenses constitute separate allowable units of prosecution. This latter inquiry involves determining such things as whether there were two murder victims, whether a victim who was assaulted on Monday was assaulted again on Tuesday, or whether multiple kinds of sex acts were committed against a victim. A "units" analysis consists of two parts: (1) what the allowable unit of prosecution is, and (2) how many units have been shown. The first part of the analysis is purely a question of statutory construction and generally requires ascertaining the focus or gravamen of the offense. The second part requires an examination of the trial record, which can include the evidence presented at trial.

*Benson*, 459 S.W.3d at 73–74 (footnotes omitted).[9]

---

[9]As stated in *Nawaz*,

A "units of prosecution" analysis, in turn, may involve one of at least two questions, depending on whether (1) the defendant is being convicted more than once for an offense defined under the *identical* statutory subsection, or . . . (2) he is being convicted more than once . . . under *different* statutory subsections of the same penal statute.

. . . .

It is purely a matter of statutory construction to ascertain the allowable unit of prosecution for an offense. *Benson*, 459 S.W.3d at 73–74. As stated in a recent opinion from the Corpus Christi–Edinburg Court of Appeals,

> [Double-jeopardy] protection, however, is subject to the [Texas] Legislature's "power to establish and define crimes." *Shelby v. State*, 448 S.W.3d 431, 435 (Tex. Crim App. 2014) (quoting *Garfias . . .* , 424 S.W.3d [at] 58 . . .). In other words, the [Texas] Legislature has the authority to allow multiple punishments for the same conduct under different theories of criminal liability. *Id.* Accordingly, a double[-]jeopardy analysis is an exercise in statutory construction, a question of law that we review de novo. *See id.*; *State v. Maldonado*, 523 S.W.3d 769, 774 (Tex. App.—Corpus Christi–Edinburg 2017, no pet.).

*Gunter v. State*, No. 13-22-00020-CR, 2023 WL 3872674, at \*2 (Tex. App.—Corpus Christi–Edinburg June 8, 2023, no pet. h.).

---

> Under the first of these two "units of prosecution" analyses, the question will often devolve into a determination of when one violation of the statutory offense has come to an end and another identically defined violation of the same statutory offense has begun[,] or it may depend on how many victims of the identically defined offense there were.

663 S.W.3d at 744. For the second kind of units-of-prosecution inquiry, "the [c]ourt must ask a different question: whether, when a single act or course of conduct by a defendant violates more than one subsection of the same penal statute, the defendant may be punished separately for violating each discrete subsection, or may he be punished only once?" *Id.* at 745.

**4.    We sustain Appellant's second point contending that he received multiple punishments for the same offense as a result of his convictions for aggravated robbery based on causing bodily injury and aggravated assault as alleged in Counts Four and Five.**

In essence, Counts Four and Five of the indictment charged Appellant with the same conduct, which is that he "cause[d] bodily injury to [the complainant] by striking him[] and [that] the defendant . . . use[d] or exhibit[ed] a deadly weapon during the commission of the assault, namely, a metal object or pot, that in the manner of its use or intended use was capable of causing death or serious bodily injury." Count Four adds the elements "while in the course of committing theft of property and with intent to obtain or maintain control of [certain] property."[10]

The gravamen of aggravated robbery and aggravated assault is assaultive conduct toward a victim. *Denton*, 399 S.W.3d at 546. In *Denton*, the Court of Criminal Appeals concluded that an aggravated-assault count was a lesser-included offense of an aggravated-robbery count in circumstances similar to that which we confront:

> As plead[ed] in the indictments, the counts for both aggravated robbery and aggravated assault assert that applicant intentionally or knowingly threatened another person with imminent bodily injury and used or exhibited a deadly weapon during the commission of that offense. The counts for aggravated robbery further allege that applicant committed theft. Thus, as plead[ed], aggravated assault is a lesser-included offense of aggravated robbery because "it is established by proof of the same or less than all the facts required to establish the commission of the offense charged[.]" Tex. Code Crim. Proc. [Ann.] art. 37.09(1).

---

[10]The offenses alleged are found in Texas Penal Code Sections 22.01(a)(1)–(2), 29.02(a)(1)–(2), and 29.03(a)(1)–(2). Tex. Penal Code Ann. §§ 22.01(a)(1)–(2), 29.02(a)(1)–(2), 29.03(a)(1)–(2).

*Id.* at 547. The aggravated assault count was a lesser-included offense of aggravated robbery, and *Denton* also concluded that there was no legislative intent to punish the offenses separately. *Id.* The logic of *Denton* applies to establish that, in violation of his right against double jeopardy, Appellant has received multiple punishments for the same offense by being punished for both aggravated robbery and aggravated assault as alleged in Counts Four and Five. The State agrees that the assessment of multiple punishments for those offenses is error.

We sustain Appellant's second point.

> **5. We sustain Appellant's third point contending that he received multiple punishments for the same offense as a result of his convictions for burglary by committing injury to an elderly individual and for committing injury to an elderly individual as alleged in Counts Three and Seven.**

Count Seven of the indictment alleges how Appellant caused bodily injury to the complainant as an elderly person. Count Three—a burglary charge—adds that Appellant "intentionally or knowingly enter[ed] a habitation, without the effective consent of [the complainant], the owner thereof, and attempted to commit or did commit the felony offense of injury to an elderly individual."[11]

The State cites us to *Torres v. State*, which concludes that injury to an elderly person is a lesser-included offense of burglary and that to punish a defendant for both

---

[11]These counts allege offenses under Penal Code Sections 22.04(a)(3) and 30.02(a)(3). *See* Tex. Penal Code Ann. §§ 22.04(a)(3), 30.02(a)(3).

offenses assesses multiple punishments in violation of the prohibition against double jeopardy:

> Here, the State alleged in paragraph one of Count IV that [a]ppellant "intentionally or knowingly enter[ed] a habitation, without the consent of [the victim], the owner thereof, and attempted to commit or committed the felony offense of Injury to an Elderly or Disabled Individual." The State further alleged in Count V that [a]ppellant "intentionally, knowingly[,] and recklessly cause[d] bodily injury to [the victim], an individual who was then and there 65 years of age or older." As such, Count IV of the indictment alleges burglary of a habitation with the actual or attempted commission of a felony (injury to an elderly person), a charge that falls under [S]ection 30.02(a)(3). *See* Tex. Penal Code Ann. § 30.02(a)(3). Under *Langs* and *Blockburger*, the injury[-]to[-]an[-]elderly[-]person offense serves as a lesser-included offense to burglary of a habitation because although the latter offense requires proof of a fact that the injury[-]to[-]an[-]elderly[-]person charge does not (i.e., entry without consent), the State must prove all the elements of the injury[-]to[-]an[-]elderly[-]person charge in order to prove the burglary offense, and thus the injury[-]to[-]an[-]elderly[-]person charge would not require proof of an additional element that the burglary offense does not also require. *See Langs*, 183 S.W.3d at 686; *Matter of T.D.N.*, 620 S.W.3d 433, 441 (Tex. App.—El Paso 2020, no pet.) (recognizing double jeopardy's prohibition of convictions for both burglary of a habitation and the underlying felony).

No. 08-22-00004-CR, 2022 WL 2965977, at *6 (Tex. App.—July 27, 2022, no pet.) (not designated for publication). We agree with the El Paso Court of Appeals' analysis. We conclude that Appellant has received multiple punishments for the same offense because he was punished for burglary by committing injury to an elderly individual and for the lesser-included offense of committing injury to an elderly individual as alleged in Counts Three and Seven.

We sustain Appellant's third point.

**6.** **We overrule Appellant's fourth point contending that he received multiple punishments for the same offense as a result of his convictions for kidnapping and aggravated assault based on the threat of the use of deadly force as alleged in Counts One and Six.**

Count One of the indictment alleges that Appellant committed aggravated kidnapping with a deadly weapon when he

> intentionally or knowingly abduct[ed] [the complainant] by restricting the movements of [the complainant] without his consent so as to interfere substantially with his liberty, by moving [the complainant] from one place to another or confining [the complainant] with the intent to prevent the liberation of [the complainant] by secreting or holding [the complainant] in a place [the complainant] was not likely to be found or using or *threatening* to use deadly force, namely a metal object or pot, and the defendant did use or exhibit a deadly weapon, namely, a metal object or pot, that in the manner of its use or intended use was capable of causing death or serious bodily injury, during the commission of the offense. [Emphasis added.]

Count Six alleges that Appellant committed aggravated assault when he

> intentionally or knowingly threaten[ed] imminent bodily injury to [the complainant], and the defendant . . . use[d] or exhibit[ed] a deadly weapon during the commission of the assault, namely, a metal object or pot, that in the manner of its use or intended use was capable of causing death or serious bodily injury.[12]

Appellant contends that he has received multiple punishments for Counts One and Six because "both a greater[-] and a lesser-included offense were alleged and [because] the same conduct was punished once for the greater offense and a second

---

[12]The count for aggravated kidnapping charges an offense under Penal Code Section 20.04(b). *See* Tex. Penal Code Ann. § 20.04(b). The aggravated-assault count charges an offense under Penal Code Sections 22.01(a)(1)–(2) and 22.02(a)(2). *See id.* §§ 22.01(a)(1)–(2), 22.02(a)(2).

36

time for lesser." The State counters that there is no multiple-punishments violation because Appellant has not received a punishment under both counts for a single act. We agree that there is no double-jeopardy multiple-punishments violation resulting from Appellant's convictions for aggravated kidnapping and aggravated assault but do so for a different reason than argued by the State.

As shown by the arguments outlined, the parties focus on whether as alleged the aggravated-assault-by-threat count is a lesser-included offense to the count of aggravated kidnapping. The aggravated-kidnapping count also includes the allegation of threat. If left purely to the question of whether the aggravated-assault charge was a lesser-included offense of the aggravated-kidnapping charge, it would be a close question. We quote one of the opinions cited by the State to show how a count of aggravated assault may or may not be a lesser-included offense of aggravated kidnapping depending on how the offenses are alleged:

> Relying on *Girdy v. State*, 213 S.W.3d 315 (Tex. Crim. App. 2006), [appellant] contends [that] aggravated assault by threat is a lesser-included offense of aggravated kidnapping because the same facts were required to establish both offenses. *Girdy*, however, is distinguishable because of how the State charged the offenses. In *Girdy*, the indictment alleged [that] the defendant committed aggravated kidnapping when he abducted the victim "by using and threatening to use deadly force on the said [victim], and with intent to inflict bodily injury on her[.]" *Id.* at 316. The indictment further alleged [that] the defendant committed aggravated assault by "threaten[ing] [the victim] with imminent bodily injury and did then and there use a deadly weapon . . . ." *Id.* The court held aggravated assault was a lesser-included offense of aggravated kidnapping because *as charged*, aggravated assault was "established by proof of the same or less than all the facts required to establish the commission of" aggravated kidnapping. *Id.* at 319 (emphasis added).

37

Here, however, aggravated kidnapping was based on the allegation that [appellant had] abducted [the victim] by restricting his movements, [by] moving him from one place to another, and by secreting or holding him—not by threat of imminent bodily injury, conduct required to prove aggravated assault by threat. Accordingly, *Girdy* does not compel us to find a double[-]jeopardy violation under *Blockburger* in this case.

*Verastegui v. State*, No. 04-18-00401-CR, 2019 WL 3307856, at *5 (Tex. App.—San Antonio July 24, 2019, no pet.) (mem. op., not designated for publication). Here the allegation of the two counts appears to come closer to the situation faced in *Girdy* and thus closer to an allegation that made the aggravated-assault charge a lesser-included offense of the aggravated-kidnapping charge.

But we do not need to examine the multiple-punishments question strictly under a *Blockburger* analysis. *Verastegui* also presented a detailed analysis under the *Ervin* factors that demonstrated that the Texas Legislature intended to allow separate punishments for aggravated kidnapping and assault by threat.[13] *Id.* We quote the analysis in full:

---

[13]*Verastegui*'s focus on the gravamen of the offense is appropriate no matter the results of an elements analysis. The Court of Criminal Appeals has noted that even if a *Blockburger* analysis results in a conclusion that the offenses are the same, a court should still examine legislative intent because

the *Blockburger* test is a rule of statutory construction[] and not the exclusive test for determining if two offenses are the same. *Bigon*, 252 S.W.3d at 370. The ultimate question is whether the [Texas] Legislature intended to allow the same conduct to be punished under both of the statutes in question. *Id.* at 371.

38

Turning to the *Ervin* factors, we must also determine whether the offenses at issue share a common focus or gravamen. *See Garfias*, 424 S.W.3d at 59. The gravamen of kidnapping is the act of abduction. *Schweinle v. State*, 915 S.W.2d 17, 19 n.2 (Tex. Crim. App. 1996). Kidnapping is a result-oriented offense because the ultimate focus is the abduction of the victim, not how the defendant restrains or interferes with the victim's liberty. *Gonzales*[ *v. State*], 270 S.W.3d [282,] 288 [(Tex. App.—Amarillo 2008, pet. ref'd) (op. on reh'g)]. The offense is legally completed when at any time during the restraint, the defendant forms the intent to prevent the victim's liberation by secreting or holding the victim in a place he is unlikely to be found. *Laster*[ *v. State*], 275 S.W.3d [512,] 521 [(Tex. Crim. App. 2009)]. On the other hand, the gravamen of aggravated assault by threat is the conduct itself, not the result, and therefore it is a nature-of-conduct crime as opposed to a result-oriented crime. *Garfias*, 424 S.W.3d at 60. There is an obvious distinction between the gravamen of each offense—the aggravated[-]kidnapping charge and conviction focused on the abduction, i.e., the actual harm inflicted, while the aggravated[-]assault[-]by[-]threat charge and conviction focused on [appellant's] threatening conduct. *Cf.* [*id.*] Accordingly, the gravamina of the two offenses indicates [that] the

---

*Shelby*, 448 S.W.3d at 436. *Shelby* went on to note that certain elements of the *Ervin* test that focus on the gravamen of the offense are the truest indication of legislative intent:

> The fifth factor [of the *Ervin* test], which requires a court to examine the "focus" or "gravamen" of a penal provision, should be regarded as the best indicator of legislative intent when determining whether a multiple-punishments violation has occurred. [*Garfias*, 424 S.W.3d at 59.] And the sixth factor described above particularly requires a court to consider the allowable unit of prosecution for the offenses when conducting an "elements" analysis. *Id.* Though this is a necessary step in analyzing a multiple-punishments claim dealing with two statutes from the same statutory section, such a determination can be indicative of legislative intent even in an "elements" analysis. *Id.*

*Id.*; *see also Nawaz*, 663 S.W.3d at 745–46 ("Ultimately, however, regardless of which of these types of analysis is the appropriate one in a given case, this [c]ourt has said that 'the best indicator' of the allowable unit of prosecution 'seems to be the focus or "gravamen" of the offense.'" (quoting *Jones v. State*, 323 S.W.3d 885, 889 (Tex. Crim. App. 2010))).

39

[Texas] Legislature intended to allow separate punishments for aggravated kidnapping and aggravated assault by threat. *See id.*

The other *Ervin* factors also support this conclusion. First, aggravated kidnapping and aggravated assault by threat are not contained in the same statutory section. *Compare* Tex. Penal Code [Ann.] § 20.04(b) (Chapter 20, Penal Code, Kidnapping, Unlawful Restraint, and Smuggling of Persons), *with id.* §§ 22.01(a)(2), 22.02(a)(2) (Chapter 22, Penal Code, Assaultive Offenses). Second, the offenses are neither phrased in the alternative nor similarly named. *Compare* Tex. Penal Code [Ann.] § 20.04(b), *with id.* §§ 22.01(a)(2), 22.02(a)(2). And third, although the trial court sentenced [appellant] to forty-five years' confinement for each offense, the offenses do not have identical punishment ranges— aggravated kidnapping in this case is a first[-]degree felony, which carries a punishment range of confinement "for life or for any term of not more than 99 years or less than five years" and a fine not to exceed $10,000.00, but aggravated assault by threat is a second[-]degree felony, which carries a punishment range of confinement "for any term of not more than 20 years or less than 2 years" and a fine not to exceed $10,000.00. *Compare* Tex. Penal Code Ann. § 12.32, *with id.* § 12.33. Finally, when as here, the [Texas] Legislature has not provided an express statement defining the allowable unit of prosecution, the gravamen of the offense best describes the allowable unit of prosecution. *See Garfias*, 424 S.W.3d at 61. As discussed above, the gravamina of [appellant's] convictions for aggravated kidnapping and aggravated assault differ. Therefore, the allowable units of prosecution are not the same. *See id.*

*Id.* (footnote omitted); *Mickens v. State*, No. 06-19-00199-CR, 2020 WL 5985200, at *4 (Tex. App.—Texarkana Oct. 9, 2020, no pet.) (mem. op., not designated for publication) (applying *Ervin* factors to conclude that aggravated kidnapping and aggravated assault may be punished separately).

We agree that applying the *Ervin* factors and focusing on the gravamina of the offenses "indicates [that] the [Texas] Legislature intended to allow separate punishments for aggravated kidnapping and aggravated assault by threat." *See*

40

*Verastegui*, 2019 WL 3307856, at \*5. Thus, the prohibition against double jeopardy does not prohibit separate punishments for Appellant's convictions for aggravated kidnapping and aggravated assault by threat.

We overrule Appellant's fourth point.

> **7.      We sustain Appellant's fifth point contending that he received multiple punishments for the same offense as a result of his convictions for two counts of aggravated assault as alleged in Counts Five and Six.**

Count Five of the indictment alleges aggravated assault with a deadly weapon when Appellant

> intentionally or knowingly *cause*[d] bodily injury to [the complainant] by striking him, and the defendant . . . use[d] or exhibit[ed] a deadly weapon during the commission of the assault, namely, a metal object or pot, that in the manner of its use or intended use was capable of causing death or serious bodily injury. [Emphasis added.]

Count Six alleges that Appellant threatened the same act.[14]

Applying the "units" test for determining whether multiple punishments have occurred when "the offenses in question are proscribed by a single statute," the State's brief makes the following concession:

> The gravamen of aggravated assault is either causing bodily injury or threatening imminent bodily injury, depending on which theory has been pleaded in the charging instrument. *Shelby* . . . , 448 S.W.3d at 438. The allowable unit of prosecution for assaultive offenses in a single instance

---

[14]These counts allege offenses under Penal Code Section 22.02(a)(2), which provides that "[a] person commits an offense if the person commits assault as defined in § 22.01 and the person[] (1) causes serious bodily injury to another, including the person's spouse[,] or (2) uses or exhibits a deadly weapon during the commission of the assault." Tex. Penal Code Ann. § 22.02(a).

is one prosecution per victim. [*Id.*] at 439. There is no indication that the [Texas] Legislature intended a single assaultive instance against a single person to yield two separate aggravated assault convictions. [*Id.*] at 439–40. Thus, the appellant's punishments for two aggravated assaults against the same victim violates his protection against double jeopardy.

We agree with the State's analysis. We conclude that Appellant received multiple punishments for the same offense in violation of his right against double jeopardy when he was punished for both aggravated assault by striking the complainant and using or exhibiting a deadly weapon and aggravated assault by threatening that conduct. *See Gunter*, 2023 WL 3872674, at *4 ("[W]here a single act caused bodily injury to a single victim, [S]ubsections 22.02(a)(1) and (a)(2) [of the Penal Code] constitute the same offense for purposes of double jeopardy.").

We sustain Appellant's fifth point.

### 8. The remedies that we utilize to address the double-jeopardy violations that we concluded have occurred.

We structure the remedy to address a multiple-punishment double-jeopardy violation as follows:

When a defendant has been prosecuted and convicted in a single criminal action of two or more offenses that constitute the same offense, in violation of double jeopardy, the remedy is to apply "the most serious offense" test and retain the conviction for the "most serious" offense. *Denton*, 399 S.W.3d at 547. The "most serious" offense is the offense for which the greatest sentence was assessed. *Ex parte Cavazos*, 203 S.W.3d 333, 338 (Tex. Crim. App. 2006); *see also Evans* . . . , 299 S.W.3d [at] 141 . . . ; *Bigon*, 252 S.W.3d at 372–73. But when the punishment for each conviction is identical, we cannot look to only the sentences imposed to determine the most serious offense. *See Bigon*, 252 S.W.3d at 373. Instead, we have to look to other criteria, including the degree of

felony for each offense, to determine which offense is the most serious. *Id.*; *White v. State*, 395 S.W.3d 828, 832 (Tex. App.—Fort Worth 2013, no pet.).

*Jones v. State*, Nos. 02-14-00068-CR, 02-14-00069-CR, 02-14-00070-CR, 2014 WL 6496965, at *3 (Tex. App.—Fort Worth Nov. 20, 2014, pet. dism'd) (mem. op., not designated for publication).

We remedy the double-jeopardy claims that we have sustained as follows:

- Second point

  Appellant received improper multiple punishments for his convictions in Counts Four and Five for aggravated robbery and aggravated assault. He received a sentence of twenty-five years for the aggravated-robbery conviction and forty years for the aggravated-assault conviction. We vacate the conviction and sentence in Count Four for aggravated robbery and retain the conviction in Count Five for aggravated assault.

- Third point

  Appellant received improper multiple punishments for his convictions in Counts Three and Seven for burglary and injury to an elderly individual. He received a sentence of twenty-five years for the burglary conviction and forty years for the injury-to-an-elderly-individual conviction. We vacate the conviction and sentence in Count Three for burglary and retain the conviction in Count Seven for injury to an elderly person.

- Fifth point

  Appellant received improper multiple punishments for his convictions in Counts Five and Six for two counts of aggravated assault. For each count, he received a sentence of forty years. In resolving Appellant's second point, we retained the aggravated-assault conviction in Count Five. Thus, we vacate the duplicate conviction in Count Six. *Cf. Jones*, 2014 WL 6496965, at *3.

## IV. Conclusion

Having overruled Appellant's first and fourth points, we affirm those judgments that survive our double-jeopardy analysis—Count One for aggravated kidnapping, Count Five for aggravated assault, and Count Seven for injury to an elderly person. Having sustained Appellant's second, third, and fifth points, we vacate and dismiss Appellant's convictions in Count Three for burglary, in Count Four for aggravated robbery, and in Count Six for aggravated assault.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: July 6, 2023

44